**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

WILLIAM O. GILLEY ENTERPRISES,
INC., a Nevada corporation doing
business in California and the
estate of William O. Gilley,
deceased; DENNIS DECOTA, an
individual; PATRICK PATRICK
PALMER, an individual on behalf of
themselves and all others similarly
situated,

          *Plaintiffs-Appellants,*

             v.

ATLANTIC RICHFIELD COMPANY;
CHEVRON CORPORATION; EXXON
CORPORATION; MOBIL OIL
CORPORATION; EXXON/MOBIL
CORPORATION; SHELL OIL COMPANY;
TEXACO INC.; TOSCO CORPORATION;
ULTRAMAR DIAMOND SHAMROCK;
VALERO CORPORATION; CONOCO-
PHILIPS PETROLEUM CORPORATION;
CHEVRON/TEXACO CORPORATION;
TESORO CORPORATION,

          *Defendants-Appellees.*

No. 06-56059

D.C. No.
CV-98-0132-BTM

ORDER AND
OPINION

Appeal from the United States District Court
for the Southern District of California
Barry T. Moskowitz, District Judge, Presiding

Argued and Submitted
February 13, 2008—Pasadena, California

Filed December 2, 2009

15675

Before: Stephen S. Trott, Richard R. Clifton and
Consuelo M. Callahan, Circuit Judges.

Per Curiam Opinion

## COUNSEL

Charles M. Kagay, Spiegel, Liao & Kagay LLP, San Francisco, California, for the plaintiffs-appellants.

Timothy D. Cohelan, Cohelan & Khoury, San Diego, California, for the plaintiffs-appellants.

Hojoon Hwang, Munger, Tolles & Olson LLP, San Francisco, California, for the defendant-appellee.

Peter H. Mason, Fulbright & Jaworski LLP, Los Angeles, California, for the defendant-appellee.

David M. Foster, Fulbright & Jaworski LLP, Washington DC, for defendant-appellee.

Patrick J. Sullivan, Law Offices of Patrick J. Sullivan, Oceanside, California, for the defendant-appellee.

# ORDER

The Opinion filed April 3, 2009, slip op. 4188, and appearing at 561 F.3d 1004 (9th Cir. 2009), is withdrawn. It may not be cited as precedent by or to this court or any district court of the Ninth Circuit.

The superseding opinion will be filed concurrently with this order. The parties may file an additional petition for rehearing or rehearing en banc. All other pending motions are denied as moot.

# OPINION

PER CURIAM:

The district court granted Defendants' motion to dismiss Plaintiffs' antitrust claim founded on § 1 of the Sherman Act, holding that 1) *Aguilar v. Atlantic Richfield Co.*, 24 P.3d 493 (Cal. 2001), precludes the allegations made in the operative pleading; 2) Defendants' exchange agreements can not be aggregated to establish market power and anticompetitive effect; and 3) even if the exchange agreements could be aggregated, the absence of a conspiracy to limit supply and raise prices eliminates a causal connection between the exchange agreements and anticompetitive effect. We have jurisdiction pursuant to 28 U.S.C. § 1291, and we affirm.

# I

## BACKGROUND

Plaintiff-Appellant William O. Gilley filed this class-action lawsuit in 1998 on behalf of himself and other wholesale purchasers of CARB gasoline in the state of California. CARB gas is a cleaner-burning fuel, and since 1996 it is the only

type of gas that can be sold in California. The complaint alleged that Defendants-Appellees, major oil producers, violated § 1 of the Sherman Act by entering into a conspiracy to limit the supply of CARB gasoline and to raise prices.

The allegations of the complaint were plainly similar to those alleged in *Aguilar*, a class-action suit filed in California Superior Court in 1996. That suit was brought under the Cartwright Act, CAL. BUS. & PROF. CODE § 16720 et seq., California's equivalent to the Sherman Act. *Aguilar*, 24 P.3d at 502. The plaintiff in *Aguilar* was a retail purchaser and consumer of gasoline and sought to represent a class of retail purchasers. The plaintiff in this action was a wholesale purchaser and retail dealer of gasoline and sought to represent a class of wholesale purchasers. Both plaintiffs were represented by the same attorneys, and both actions targeted the same defendants for essentially the same allegedly unlawful conduct. Because of the similarity in the cases, the district court hearing this case stayed the suit pending the outcome of *Aguilar*.

In *Aguliar*, the state superior court granted summary judgment to the defendants, concluding that there was insufficient evidence presented by the plaintiffs to allow a reasonable juror to find a conspiracy to limit supply and raise prices among the several gasoline companies. *Id.* at 503. The California Supreme Court affirmed. *Id.* at 521. As a result, Defendants in this case brought a motion for summary judgment arguing that Gilley's claims were barred by collateral estoppel. In response, Gilley offered a proposed amended complaint, which the court found insufficient. The district court, however, granted Gilley leave to provide another proposed amended complaint, which he did.

On May 6, 2002, the district court granted Defendants' motion for summary judgment on that complaint, holding that Gilley was precluded by *Aguilar* from relitigating whether a conspiracy existed to limit supply and raise prices. However, the court granted Gilley further leave to amend the complaint

to allege that "each of the bilateral agreements, entered into independently between various defendant gasoline companies, ha[s] anti-competitive effects and therefore violate[s] the Sherman Act."

On May 24, 2002, Gilley filed the third post-*Aguilar* complaint, alleging that forty-four bilateral exchange agreements had the effect of unreasonably restraining trade in violation of § 1 of the Sherman Act and in violation of CAL. BUS. & PROF. CODE § 17200. On March 27, 2003, the district court granted Defendants' motion to dismiss that complaint with prejudice. With respect to the § 1 claim, the court explained that Gilley had not alleged any theory as to how any individual exchange agreement, which accounts for a small percentage of the relevant market, is able to inflate the price of CARB gasoline. The district court rejected Gilley's argument that the court could consider the aggregate effects of the individual bilateral agreements to allege an anticompetitive effect—namely higher gas prices.

Gilley appealed to this Court, which reversed and remanded, holding that the district court erred in not giving Gilley an opportunity to correct the newly identified deficiencies. After the remand, the second amended complaint ("SAC") was filed.

The district court granted Defendants' motion to dismiss the SAC, holding that Plaintiffs failed to allege that the exchange agreements, when considered individually, would be capable of producing significant anticompetitive effects. We now review the district court's dismissal of the SAC.

## II

## DISCUSSION

### A.   Standard of Review

We review de novo a dismissal for failure to state a claim pursuant to Rule 12(b)(6). *Knievel v. ESPN*, 393 F.3d 1068,

1072 (9th Cir. 2005). All allegations of material fact are taken as true and construed in the light most favorable to the non-moving party. *Id.* On a motion to dismiss in an antitrust case, a court must determine whether an antitrust claim is "plausible" in light of basic economic principles. *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 556 (2007).

## B.   Analysis

We address the following issues in this appeal: 1) the preclusive effect of the California Supreme Court's decision in *Aguilar*; 2) the pleading standard for § 1 claims; 3) the sufficiency of Plaintiffs' SAC; and 4) the state law claim under CAL. BUS. & PROF. CODE § 17200.[1]

### 1.   The Preclusive Effect of the California Supreme Court's *Aguilar* Decision.

Gilley does not dispute that the decision in *Aguilar* has some preclusive effect in the current lawsuit, but he contends that his current claim is not entirely extinguished by *Aguilar*. In contrast, Defendants argue that all of the allegations as pleaded in the SAC are precluded by *Aguilar*. We conclude that Gilley's claims are precluded by the California Supreme Court's decision.

[1] Section 1 of the Sherman Act prohibits "[e]very contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce among the several States." 15 U.S.C. § 1. The Supreme Court has clearly established that the section is limited to prohibiting unreasonable restraints of trade. *See Texaco Inc. v. Dagher*, 547 U.S. 1, 5 (2006). Whether a plaintiff pursues a per se claim or a rule of reason claim under § 1, the first requirement is to allege a

---

[1]Our holding renders moot the issue of Plaintiff's standing to add Tesoro as a Defendant.

"contract, combination in the form of trust or otherwise, or conspiracy."

**[2]** The core of the plaintiff's claims in *Aguilar* was a per se claim based on an alleged unlawful conspiracy among petroleum companies. The California Supreme Court's opinion in *Aguilar* states:

> Just as the superior court's order granting the petroleum companies summary judgment was not erroneous as to Aguilar's primary cause of action for an unlawful conspiracy under section 1 of the Cartwright Act to restrict the output of CARB gasoline and to raise its price, neither was it erroneous as to her derivative cause of action, which was for an unlawful conspiracy under the unfair competition law for the same purpose.

> . . .

> The petroleum companies carried their burden of persuasion to show that there was no triable issue of material fact and that they were entitled to judgment as a matter of law as to Aguilar's unfair competition law cause of action. They did so by doing so as to her Cartwright Act cause of action. Again, they carried their burden of production to make a prima facie showing of the absence of any conspiracy, but she did not carry her shifted burden of production to make a prima facie showing of the presence of an unlawful one.

> It is true, as Aguilar argues, that her unfair competition law cause of action is not based on allegations asserting a conspiracy *unlawful under the Cartwright Act.* But it is indeed based on allegations asserting a *conspiracy,* specifically, one unlawful at least under the unfair competition law itself. As stated, the

petroleum companies showed that there was no triable issue of the material fact of conspiracy. Aguilar claims that conspiracy is not an element of an unfair competition law cause of action in the abstract as a matter of law. Correctly so. (See Bus. & Prof. Code, § 17200). But she simply cannot deny that conspiracy is indeed a component of the unfair competition law cause of action in this case as a matter of fact.

*Id.* at 521 (emphasis in original).

**[3]** This portion of *Aguilar* holds that the plaintiffs had failed to demonstrate the existence of a conspiracy that was per se illegal or otherwise illegal under the Sherman Act.

The preclusive effect of *Aguilar* is woven through the numerous court decisions in Gilley's federal action. Gilley filed this class action in 1998, and its proceedings were stayed pending the outcome of *Aguilar*. After the California Supreme Court issued its opinion in *Aguilar*, the defendants filed a motion for summary judgment. Gilley opposed the motion and also offered to file an amended complaint. The district court granted the motion for summary judgment. The district court held that pursuant to the doctrine of issue preclusion, Gilley was barred from relitigating the conspiracy alleged in *Aguilar*. The court denied Gilley's request to amend the complaint to allege continuing violations of antitrust laws subsequent to the time period involved in *Aguilar*, reasoning:

> The exchange agreements were already judged by the California Supreme Court not to be evidence of a conspiracy. The court finds that the proposed amended complaint merely alleges the ongoing use of these supply agreements and not any new conduct. Issue preclusion therefore bars Gilley from relitigating whether use of the ongoing agreements constitute an illegal conspiracy under the Sherman Act.

The district court, however, agreed with Gilley that "his rule-of-reason claim has not been litigated to the extent that he is alleging that the individual bilateral exchange agreements violate the anti-trust laws due to their anti-competitive effect." Accordingly, it granted Gilley leave to file an amended complaint "only to the extent that it alleges that each of the bilateral agreements, entered into independently between various defendant gasoline companies, have unreasonable anti-competitive effects and therefore violate the Sherman Act."

Gilley amended his complaint. Defendants responded by filing a motion to dismiss the First Amended Complaint ("FAC"). The district court granted the motion, explaining:

> After careful scrutiny of the FAC, the court has been unable to discern any allegation that any of the parties in any of the bilateral agreements entered these agreements with an unlawful intent or purpose to restrain competition. In the few instances that Plaintiff does allege an improper purpose, he does so by alleging joint action among all, or substantially all of the defendants. As discussed below, Plaintiff's pleading of such joint purpose or action regarding the various defendants is improper and will not be considered by the court. Therefore, Plaintiff has failed to properly allege "concerted action" regarding any individual bilateral exchange agreement.

The district court dismissed the case with prejudice, commenting that because "Plaintiff was already granted leave to amend his complaint previously, and at this late date was unable to set forth a valid anti-trust claim, it appears that Plaintiff cannot allege sufficient facts constituting a valid § 1 claim."

Gilley appealed, and we reversed and remanded to allow Gilley an opportunity to file a further amended complaint. We

held that the district court had abused its discretion by deny-ing Gilley an opportunity to amend his complaint.

When Gilley filed a Second Amended Complaint, defen-dants again moved to dismiss, and the district court granted the motion. It explained:

> Plaintiffs do not allege that each exchange agree-ment has a discrete effect on competition which can be viewed together with the separate effects of the other exchange agreements. Instead, Plaintiffs allege the existence of a network of exchange agreements that allow Defendants to coordinate their production and output, thereby limiting the amount of CARB gasoline on the rack or spot market and allowing Defendants to raise prices to branded dealers.
>
> Even if a single defendant and all of the defendants who contracted with that defendant cumulatively had sufficient market power to substantially impair com-petition, Plaintiffs would need to make the further showing that all of these defendants worked together through the use of the exchange agreements and stra-tegic shutdowns or decreased production to stabilize the spot market and avoid the depression of gasoline prices. . . .
>
> Plaintiffs cannot avoid the fact that their Sherman Act claim is, at its core, a conspiracy claim. Plain-tiffs' theory of recovery rests upon the existence of a web of exchange agreements that allegedly allows all of the Defendants to engage in a precise dance of give-and-take with the goal of maintaining the deli-cate balance of CARB production. Coordinated action is essential to Plaintiffs' claim.
>
> After four attempts to plead around a conspiracy claim, Plaintiffs still fail to allege that the bilateral

exchange agreements, *viewed independently*, constitute an unreasonable restraint on trade. Plaintiffs' inability to establish a causal connection between the individual exchange agreements, and anti-competitive harm is fatal to Plaintiffs' Sherman Act claim.

[4] A critical aspect of the district court's perspective was its determination that the SAC did not allege "that each exchange agreement has a discrete effect on competition which can be viewed together with the separate effects of other exchange agreements." Rather, the district court saw the SAC as alleging "a network of exchange agreements" that "allow Defendants to coordinate their production and output." In essence, the district court read the SAC as not alleging that the bilateral agreements "violate the anti-trust laws due to their anti-competitive effect," but rather that the agreements facilitate coordinated action by the defendants that unlawfully restrains trade. We agree.

[5] This distinction is critical. If the bilateral agreements in themselves have an illegal effect on competition (when aggregated), then the bilateral agreements constitute the "contract, combination or conspiracy" required for a claim under § 1 of the Sherman Act. If, however, the bilateral agreements only facilitate coordinated activity, then to maintain a claim under § 1 of the Sherman Act, Gilley must show some meeting of the minds, some "contract, combination or conspiracy," between those defendants whom Gilley alleges coordinated their actions. Although a plaintiff might well be able to do so in the abstract, here, Gilley is precluded by *Aguilar* from asserting that the defendants so conspired.

[6] The Second Amended Complaint implicitly, if not explicitly, asserts a conspiracy. The charging paragraphs of the SAC describe the defendants' parallel actions and imply the existence of a conspiracy. The SAC asserts:

California's CARB gas supply is generally manufactured primarily by defendants, California branded refiners, who are engaged in the business of refining, distributing and selling almost 100% of the CARB gas in the state of California during the class period. California remains largely isolated from external sources of supply.

All California refiners, now also major retail marketers, control supply and pricing from production to distribution, in part, through supply agreements that require dealers to purchase gasoline exclusively at each branded refiner's present DTW price, a price that is always greater than the rack price and cost of distribution.

California refiners' weekly refinery production decisions are influenced by, among other things, spot price impact, refiner margins, bilateral exchange partners' market needs, ability to draw inventory from bilateral exchange partners, and overall market supply.

With the impending introduction of CARB gasoline in 1996, each of the defendants or their predecessors in interest, entered into new sales and/or exchange agreements with other defendants, many of which provided for the provision of CARB gas "as mutually agreed" (AMA) with no minimum or maximum.

The determination that these paragraphs assert a conspiracy is reinforced by the next paragraph of the SAC which reads:

The sales and exchange agreements known to plaintiffs that are subject of this action are listed on the attached Exhibit . . . . On information and belief, plaintiffs allege that defendants have entered into

> other sales and exchange agreements, presently unknown to plaintiffs, with similar intent and effect.

Certainly the tenor of this paragraph is that the "similar intent and effect" violates antitrust laws. Moreover, in light of the preceding paragraphs and the failure to assert any other specific violation of the Sherman Act, the alleged violation must be one of conspiracy or collusion.

This allegation of conspiracy is carried forward in the SAC's allegations against particular defendants, starting with Chevron.[2] It lists three exchange agreements that Chevron entered into with Exxon, Shell, and Tosco Refining Co., and alleges, on information and belief, that Chevron has entered similar agreements "for the delivery of CARB in Northern California." The SAC then alleges:

> Chevron's intent and purpose in entering into these exchange agreements was to limit refining capacity for CARB gas and/or to keep CARB gas out of the spot market and away from unbranded marketers.

> Through the use of these exchange agreements, **coupled with its own refining capacity and that of its contracting partners**, Chevron has obtained sufficient market power to limit the supply of CARB gas to unbranded marketers and to raise the price at which it sells CARB gas in Northern California to supracompetitive levels. These agreements have had the effect of raising CARB gas prices in Northern California above competitive levels, without any countervailing procompetitive benefit.

[2]The allegations against the other defendants are similar to the allegations against Chevron.

(emphasis added).

**[7]** These paragraphs reveal how Gilley proposes to meet the market power requirement for a claim under § 1 of the Sherman Act, but they leave the reader uninformed as to how the individual exchange agreements allegedly violated the Sherman Act "without a conspiracy to control supply or to set prices." In his brief, Gilley responds by pointing to the paragraphs concerning the relationship between Chevron and Tosco. These paragraphs set forth various reasons for why the defendants purportedly entered into particular agreements,[3] suggest an industry-wide conspiracy,[4] and assert that the individual agreements facilitated a combination or conspiracy.[5]

---

[3]For example, the SAC sets forth a 1994 individual exchange agreement between Chevron and Tosco and alleges:

> Chevron's intent and purpose in entering into this agreement with Tosco was to place its surplus CARB gas with other branded refiners to maximize returns. Chevron intended to and did rearrange its CARB gas supply to avoid a market imbalance caused by CARB gas flowing to independent marketers.

If Chevron and Tosco agreed to restrain the production of gas, the individual exchange agreement might well be a contract to restrain trade pursuant to § 1 of the Sherman Act. The paragraph, however, does not say that the parties agreed. Instead, it only addresses Chevron's intent and purpose. This purpose and intent would presumably motivate Chevron to act independently or interdependently without any agreement as to purpose or intent with Tosco.

[4]For example, the SAC alleges that "[t]hrough the use of these exchange agreements, coupled with its own refining capacity and that of its contracting partners, Chevron has obtained sufficient market power to limit the supply of CARB gas to unbranded marketers and to raise the price at which it sells CARB gas." This implies a broader conspiracy, though the SAC does not allege that there was a meeting of the minds of the parties to raise the price of gasoline specifically in connection with any of the individual exchange agreements.

[5]For example, the SAC alleges that "Tosco's intent and purpose in entering into this agreement with Chevron was [to] join the 'club' of major branded refiners and to give Chevron the opportunity to place its surplus CARB gas with other branded refiners to maximize returns." This is confusing, as it indicates that Tosco's intent was to give Chevron "the opportunity" to maximize its return. This seems to suggest that the individual exchange agreement facilitated, but did not in itself provide for, the maximization of Chevron's return.

Again, the paragraphs seem to allege a conspiracy. They certainly do not clearly allege that the exchange agreements themselves constitute a restraint of trade or suggest why the defendants' actions were "collusive, rather than independent, action." *See Aguilar*, 24 P.3d at 519.

[8] In sum, the SAC, plainly and fairly read, is not limited to alleging that the bilateral exchange agreements are themselves restraints of trade. Instead, its broad allegations encompass conspiracy claims that are precluded by *Aguilar*.

[9] The breadth of the SAC is inconsistent with the spirit of *Twombly*, 550 U.S. 544. Although *Twombly* involved an alleged conspiracy based on parallel conduct and this case is ostensibly not a conspiracy case, we have held that *Ashcroft v. Iqbal*, ___ U.S. ___, 129 S. Ct. 1937, 1953 (2009), makes clear that the pleading requirements stated in *Twombly* apply in all civil cases, including this one. *Doe I v. Wal-Mart Stores, Inc.*, 572 F.3d 677, 683 (9th Cir. 2009). The Supreme Court reiterated that Federal Rule of Civil Procedure 8(a)(2) requires " 'a short and plain statement of the claim showing that the pleader is entitled to relief,' in order to 'give the defendant fair notice of what the . . . claim is and the grounds upon which it rests.' " *Twombly*, 550 U.S. at 554-55 (quoting *Conley v. Gibson*, 355 U.S. 41, 47 (1957)).[6] It commented that a plaintiff's obligation "requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of

---

[6]The Court went on to disapprove the language in *Conley* that "a complaint should not be dismissed for failure to state a claim unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *Twombly*, 550 U.S. at 561 (quoting *Conley*, 355 U.S. at 45-46). The Court held that:

> [t]he phrase is best forgotten as an incomplete, negative gloss on an accepted pleading standard: once a claim has been stated adequately, it may be supported by showing any set of facts consistent with the allegations in the complaint.

*Twombly*, 550 U.S. at 563.

action" and that "[f]actual allegations must be enough to raise a right to relief above the speculative level." *Id.* at 555 (internal citations omitted). The Supreme Court reaffirmed its earlier decisions holding that "something beyond the mere possibility of loss causation must be alleged, lest a plaintiff with a largely groundless claim be allowed to take up the time of a number of other people with the right to do so representing an *in terrorem* increment of the settlement value," and that "when the allegations in a complaint, however true, could not raise a claim of entitlement to relief, this basic deficiency should . . . be exposed at the point of minimum expenditure of time and money by the parties and the court." *Id.* at 558 (internal quotation marks and citations omitted). The Court concluded that allegations of parallel conduct in themselves do not provide a sufficient basis to sustain a conspiracy claim.[7]

Moreover, in *Ashcroft v. Iqbal*, 129 S. Ct. 1937 (2009), the Supreme Court affirmed that its decision in *Twombly* "expounded the pleading standard for all civil actions." *Id.* at

---

[7]The Court noted:

We think that nothing contained in the complaint invests either the action or inaction alleged with a plausible suggestion of conspiracy. As to the ILECs' supposed agreement to disobey the 1996 Act and thwart the CLECs' attempts to compete, we agree with the District Court that nothing in the complaint intimates that the resistance to the upstarts was anything more than the natural, unilateral reaction of each ILEC intent on keeping its regional dominance. The 1996 Act did more than just subject the ILECs to competition; it obliged them to subsidize their competitors with their own equipment at wholesale rates. The economic incentive to resist was powerful, but resisting competition is routine market conduct, and even if the ILECs flouted the 1996 Act in all the ways the plaintiffs allege, . . . there is no reason to infer that the companies had agreed among themselves to do what was only natural anyway; so natural, in fact, that if alleging parallel decisions to resist competition were enough to imply an antitrust conspiracy, pleading a § 1 violation against almost any group of competing businesses would be a sure thing.

550 U.S. at 566.

1953 (internal quotation marks and citation omitted). The Court reiterated that "where the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged — but it has not 'show[n]' — 'that the pleader is entitled to relief.' Fed. R. Civ. P. 8(a)(2)." *Id.* at 1950.

In this case the district court read the complaint as not stating a viable cause of action. It determined that the SAC did not allege that "each exchange agreement has a discrete effect on competition which can be viewed together with the separate effects of other exchange agreements," but rather as alleging "the existence of a network of exchange agreements that allow Defendants to coordinate their production and output." We read the SAC as not asserting that the bilateral agreements, in themselves, restrain trade, but that they facilitate or make it easier for the defendants to coordinate their actions to restrain trade. The district court explained:

> Even if a single defendant and all of the defendants who contracted with that defendant cumulatively had sufficient market power to substantially impair competition, Plaintiffs would need to make the further showing that all of these defendants worked together through the use of the exchange agreements and strategic shutdowns or decreased production to stabilize the spot market and avoid the depression of gasoline prices. . . .

This is the type of "*in terrorem* increment of the settlement value" that the Supreme Court mentioned in *Twombly*. *Id.* at 558. Moreover, when viewed in the light of the preclusive effect of *Aguilar*, the SAC simply "does not raise a claim of entitlement to relief." *Id.*

[10] There can be little doubt that the broad scope of the SAC was intentional. Gilley has known since 2002 that following *Aguilar*, he was precluded from alleging a conspiracy.

Nonetheless, he has thrice been given the opportunity to amend his complaint to limit it to a claim based solely on the alleged anti-competitive effect of the individual exchange agreements absent a conspiracy, and has thrice proffered amended complaints that continue to assert, albeit ever more subtly, the existence of a conspiracy. It might be possible for Gilley to allege an antitrust claim limited to issues that are not precluded by *Aguilar*, but he has declined to do so. Accordingly, the district court properly struck the SAC.

**[11]** Furthermore, the district court's final denial of leave under the circumstances of this case was not an abuse of discretion.[8]

# III

## CONCLUSION

We recently reiterated in *Kendall v. Visa U.S.A., Inc.*, 518 F.3d 1042, 1047 (9th Cir. 2008), that "[t]o state a claim under Section 1 of the Sherman Act, 15 U.S.C. § 1, claimants must plead not just ultimate facts (such as a conspiracy), but evidentiary facts which, if true, will prove: (1) a contract, combination or conspiracy among two or more persons or distinct

---

[8]In *Griggs v. Pace Amn. Group, Inc.*, 170 F.3d 877, 880 (9th Cir. 1999), we held that the "district court determines the propriety of a motion to amend by ascertaining the presence of any of four factors: bad faith, undue delay, prejudice to the opposing party, and/or futility." Generally, "this determination should be performed with all inferences in favor of granting the motion." *Id.* Nonetheless, "we have noted that a district court does not abuse its discretion in denying a motion to amend a complaint . . . when the movant presented no new facts but only new theories and provided no satisfactory explanation for his failure to fully develop his contentions originally." *Nunes v. Ashcroft*, 375 F.3d 805, 808 (9th Cir. 2004) (quoting *Vincent v. Trend W. Technical Corp.,* 828 F.2d 563, 570-71 (9th Cir.1987)) (internal quotation marks omitted). Here, assuming that Gilley could, in the abstract, amend his complaint to state a claim that is not precluded by *Aguilar*, his repeated failure to do just that suggests that it would be futile to offer him another chance to do so.

business entities; (2) by which the persons or entities intended to harm or restrain trade or commerce . . . (3) which actually injures competition." Gilley, in order to state a § 1 claim, must plead "a contract . . . by which the persons or entities intended to harm or restrain trade." Despite its length and detail, the SAC does not clearly assert which individual agreement or agreements constitute in themselves a "contract . . . by which the persons or entities intended to harm or restrain trade." Rather, the SAC is fairly read as alleging the existence of a network of exchange agreements that arguably allowed the defendants to unlawfully coordinate their production and output. But given the preclusive effect of *Aguilar*, Gilley cannot show such coordination. The SAC is not saved by the argument that it could be read to encompass a claim that the individual agreements in themselves constitute a restraint of trade because the SAC does not provide the defendants fair notice of such a claim and the grounds upon which it rests. *See Twombly*, 550 U.S. at 555. Moreover, aggregation does not save the SAC because it does not show that the defendants' adjustments of CARB production were part of any agreement or conspiracy, rather than independent efforts to maximize profits. *See Twombly*, 550 U.S. at 566. For these reasons, we affirm the district court's dismissal of the Second Amended Complaint without leave to amend, and we affirm the court's dismissal of Plaintiffs' state law claim brought pursuant to CAL. BUS. & PROF. CODE § 17200.

**AFFIRMED.**